(No. 15920.—Judgment affirmed.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* CHARLES BORELLA, Plaintiff in Error.

*Opinion filed April 14, 1924.*

1. CRIMINAL LAW—*what is a dying declaration.* A dying declaration is a statement of fact concerning the cause and circumstances of the homicide, made by the victim under the solemn belief that his death is inevitable and near at hand.

2. SAME—*dying declaration must be made with fixed belief that death is impending.* For a dying declaration to be admissible, the declarant must have entertained a fixed belief that death is inevitable and imminent.

3. SAME—*belief that death is imminent may be induced by statements of physician or nurse.* To constitute a dying declaration it is not necessary that approaching death be presaged by the personal feelings of the deceased, but the test is whether or not the declarant has abandoned hope of living and looks on death as certainly impending, and if so, his declarations are competent though he is brought to that state of mind by statements made to him by nurses or physicians.

4. SAME—*what statement does not render dying declaration incompetent.* The fact that the declarant, when first asked whether or not he knew he was going to die, said, "Well, I am going to fight for it," is not, of itself, sufficient to disprove a state of mind viewing his death as certain and impending when the statement was made and will not render incompetent his dying declaration made after he had expressed his belief that he would not get well, which belief was induced by the statement of his nurse and physician that he could not recover.

5. SAME—*why dying declarations are admitted in evidence.* Dying declarations are admitted in evidence not as part of the *res gestæ* or because they may have been made in the presence of the accused, but because they are made when the mind is influenced by the fact of impending death, and when every motive to falsehood has disappeared and there is as much likelihood that the declarant will speak the truth as if he were under oath.

6. SAME—*when declarations are admissible as res gestæ.* Declarations are admissible as *res gestæ* on the ground that they are the natural and spontaneous utterances of the declarant so closely connected with the transaction in question as to be, in effect, a part of it, there having been no opportunity for premeditation or design.

7. SAME—*dying declaration may contain matter not admissible as res gestæ.* A statement offered as a dying declaration, when made under the conditions prescribed by law, is competent as to any matter material to the issue on trial even though not admissible as a part of the *res gestæ,* and it is not rendered inadmissible because it refers to the declarant's fight with the accused two or three hours before the homicide.

8. SAME—*statement may be admissible as dying declaration and as res gestæ.* A statement may be competent either as a dying declaration or as a part of the *res gestæ* where it complies with the requirements of the law as to both.

9. SAME—*when instruction as to self-defense is not accurate—reversal.* Self-defense does not depend upon whether the evidence shows the danger to be real or otherwise, but whether the circumstances are such that the defendant, as a reasonable man, believed or was justified in believing that he was in great danger, and an instruction is not accurate which states that the danger must be real or apparent, imminent and pressing; but the erroneous statement will not cause a reversal where another part of the same instruction, as well as the following instruction, states the proposition correctly.

10. SAME—*when instruction referring to particular fact in evidence is not prejudicial.* Where evidence in a murder trial that the deceased had a fight with the accused two or three hours before the shooting which resulted in the homicide is not controverted, an instruction which states that the fact that the deceased knocked the accused down in said fight would not be a complete defense if the jury believe from all the evidence that the accused is guilty as charged, although erroneous in singling out a particular fact in evidence, is not prejudicial where there is no dispute as to what occurred at the fight.

WRIT OF ERROR to the Circuit Court of Perry county; the Hon. LOUIS BERNREUTER, Judge, presiding.

COOK & HARRIS, (L. A. CRANSTON, of counsel,) for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, JUDSON E. HARRIS, State's Attorney, and GEORGE C. DIXON, for the People.

Mr. JUSTICE STONE delivered the opinion of the court:

Plaintiff in error was tried and convicted in the circuit court of Perry county of the crime of murder of John Giles. His punishment was fixed at imprisonment in the penitentiary for the term of his natural life. He brings the cause here for review, assigning as error the admission of the dying declaration of the deceased and certain instructions given by the court on behalf of the People.

The defense was self-defense. Both plaintiff in error and the deceased were coal miners, residing in the city of DuQuoin. On the afternoon of April 14, 1923, they met in what was known as Eagle's Hall, on West Main street, in the city of DuQuoin, both being members of the lodge that met there. Some discussion arose among the members concerning two candidates for mayor of the city, and Giles struck plaintiff in error and knocked him down over some empty boxes and while he was sitting on the boxes struck him again. None of the witnesses, aside from plaintiff in error, state what was said between him and Giles at the time the blows were struck. Plaintiff in error testified that Giles called him a liar, to which he replied, "No, I ain't no liar," and that Giles struck him. It appears that thereupon Giles left the building. Plaintiff in error left soon after and went to the home of his sister, where he was living, and washed the blood off his face, took his revolver from a dresser drawer and went down-town to the poolroom of one Lewis, situated across the street from Eagle's Hall. He purchased a cigar there and went to the front of the pool-hall and stood in the doorway until Giles returned, some twenty-five or thirty minutes later. It appears that after the difficulty between these men in Eagle's Hall, Giles with some friends went in an automobile to a dance hall and soft drink parlor known as the White House, northwest of the city, and after being there about three-quarters of an hour, five men, including Giles, returned to town in the automobile of the witness James Martin. Two of the

men got out of the automobile and went to their homes before the party reached the business part of the city, and Martin, with the witness Howard Wheatley and Giles, drove on to the pool-hall. The car was parked in front of the pool-hall and the occupants all left it and started to cross the sidewalk to the pool-room. Borella was standing in the doorway and in the manner detailed by eye-witnesses shot Giles.

The testimony of the attending physician is that deceased received one wound through the right elbow, just above the joint, a wound in the right chest one inch below the right nipple, penetrating the chest cavity, and two bullet wounds in the right side; that he found five bullet wounds on the body of the deceased; that he died April 17, 1923, three days after the shooting.

In order to understand clearly the testimony of the witnesses concerning the shooting it is necessary to describe the location. Lewis' pool-hall is located on West Main street, about the middle of the block, west of the cross-street known as Chestnut street. Main street extends east and west in the city of DuQuoin and Chestnut street north and south. The street to the west of Lewis' pool-room extends north and south and is known as Walnut street. In approaching the pool-room, the deceased, with his two companions, traveled east on Main street from Walnut street. The pool-room is on the north side of Main street, and in order to park the car in front of it, it was necessary, according to the testimony of the witnesses, to drive east to a traffic post at the intersection of Main and Chestnut streets and turn around that post. After doing so, Martin drove back and parked his car in front of the pool-room, on the north side of Main street. The width of the sidewalk at this point is variously estimated by witnesses to be from sixteen to twenty feet. The front door of the pool-room is in a recess in the building four or five feet in depth, across the front of which had been constructed a frame as

a screen, even with the sidewalk. In the middle of this was
a doorway estimated to be from three and a half to four
feet in width, on which a screen door was hung in the sum-
mer though no screen door was in place there at that time.
Borella was standing leaning against the west door-post of
the screen doorway with his arm extended across the door-
way, his hand resting on the east door-post.

Upon parking the car, Martin, Wheatley and Giles
alighted and Giles started into the building. Up to this
point there appears to be no dispute as to what occurred.
According to the testimony of Wheatley, when Giles started
into the pool-room, he (Wheatley) was on the pavement
opposite the pool-room door. Borella was leaning against
the door-post, with his left hand against the other side, and
Giles started to go under his arm, when some words were
spoken which the witness could not understand; that Giles
backed off toward the east and Borella pulled his gun from
his shirt or belt and began firing, Giles backing away from
him; that Borella fired five shots; that when the shooting
began Giles backed up as far to the east as Geiger's bakery
shop, which was the second door, a bank being between the
pool-room and the bakery; that after the last shot Giles
got off the sidewalk and went around a car standing on
Main street. Witness stated that he did not notice what
Borella did after that; that Giles had nothing in his hand
at the time of the shooting. This witness testified that
Giles weighed about 170 pounds and was a smaller man
than Borella.

Martin testified that when they alighted from the car
he followed Giles and Wheatley toward the pool-room door.
Borella was standing with his arm across the door and said
something which witness could not hear clearly; that Giles
also spoke but witness did not understand what was said;
that Giles started into the pool-room, under Borella's arm;
that the witness was at that time standing in front of Bo-
rella on the sidewalk; that Borella ran his hand down in-

side his shirt; that Giles had not done anything or made any motion that the witness saw before Borella reached down into his shirt; that at that time the witness was within six feet of them; that he, upon seeing Borella reach into his shirt, turned and went into Schleper's store, next door west; that as soon as he got into the store he heard five shots and came out and saw Borella standing just a little east of the pool-room door, toward the bank; that Giles at that time was just coming up onto the sidewalk from around an automobile; that Giles went into the pool-room, as did witness; that Giles stayed about two minutes and then came out with Wheatley and witness and was put into witness' car and taken away; that as Giles went into the pool-room Borella was standing in front of the pool-room door, with his pistol in his hand. This witness stated that Giles had no weapon that he knew of.

Pete Neira testified that he was standing in front of the pool-room opposite the pool-room door, at the edge of the pavement, with his left arm on a hitching rail, talking to two friends; that he did not notice Giles approaching the pool-room; that the first thing he knew of the trouble was the shooting; that he heard no argument between these parties and he heard five shots; that as soon as the shooting began he ran back of a car that was parked there and did not see who was shooting but after the shooting he saw Borella and Giles; that the former was standing to the right of the witness and about six feet north of him; that he had a revolver in his hand, by the side of his right leg; that Giles backed away from Borella to Geiger's bakery, then backed south across the sidewalk and walked back of a car standing there and then back across the sidewalk into the pool-room; that in about three minutes he came out with two friends, who helped him into the car; that he was holding his hand on his right side; that during this time Borella was standing on the sidewalk holding his revolver in his hand until his brother came and took him away.

Lewis, the proprietor of the pool-room, testified that he saw Borella come into the pool-room and buy a cigar and go out and stand in the front door; that he was there about half an hour before the shooting took place; that when he heard the first shot he looked to the front of the building and saw Borella but did not see Giles and saw the fire from the gun; that it looked as though Borella was shooting southeast; that when shooting, Borella was standing four or five feet from the doorway.

Noah Stoker, called for the defense, testified that he was leaning against the building in front of the pool-room, about twelve feet west of the door; that Borella was standing in the doorway; that he saw Giles have hold of Borella's coat, pushing him back onto the walk about twelve or fifteen feet southwest from the door; that Giles was moving his arm as though he was going to strike Borella; that when Borella drew his gun Giles grabbed for it; that witness saw Borella's gun and heard the shots fired, and that at the time the fifth shot was fired Giles was backing up toward the State Bank, with his hands down. This witness testified that he did not hear anything said; that when he first saw these parties Giles had hold of Borella's coat; that that was the position they were in at the time of the first shot; that after the first shot Giles let loose of Borella's coat and started backing away; that Giles had nothing in his hand and was still backing away when the rest of the shots were fired. This witness does not say that Giles struck at Borella.

Louis Weilmunster testified that he was inside of the pool-room, about three feet from the door; that Giles was standing in front of Borella; that it looked to the witness as though Giles swung at Borella with his fist about half way and Borella stepped back and began shooting; that the parties were on the sidewalk; that after the first shot Giles was backing away; that the first thing that attracted witness' attention was when they stepped south onto the

sidewalk and Giles swung at Borella, and that Giles had nothing in his hand but tried to grasp the pistol when the first shot was fired. This witness did not hear anything that was said.

Plaintiff in error testified that after Giles knocked him down in Eagle's Hall he went home, washed and cleaned the blood off his face; that he went to the dresser to get a handkerchief and found his pistol there and took it and went to Lewis' pool-room; that he bought a cigar and went out the front door, leaning on the door-post of the screen door twenty-five or thirty minutes; that a car drove up with Martin, Giles and Wheatley in it; that Giles jumped out in a hurry, unbuttoning his coat and coming straight for him. He testified: "I thought he was going to shake hands. I takes my hand from the back and he grabs me like that, and I pushed him off. He grabbed me by the coat, and I asked him, 'What have I ever done to you?' and he said, 'I am going to kill you.' He immediately passed with his left hand and struck at me, and I ducked. I tried to get loose from him and he made a couple more passes. He reaches back and said he will kill me, and had hold of me. I pulled out my pistol and fired as he reached in his pocket. Then he turned me loose and backed up, still with his hand in his hip pocket. He backs up and makes another dive for me, and I told him to leave me alone, and he comes back again, with his hand in his hip, trying to pull out his hand, and I fired the other shots. He did not back off at the time I presented my pistol but after I had fired three shots." Plaintiff in error stated he does not know whether Giles had anything in his hand or not.

Harry Benton, a newspaper reporter, testified that he saw Borella at the police station; that Borella there stated that when Giles came to the pool-room he (Borella) said, "Why did you treat me that way?" and Giles said, "What of it?" that he thought Giles was going to strike him and so drew his gun and started shooting; that Giles made no

attempt to draw a weapon but made a motion as though he was going to strike him. This witness stated that the State's attorney, who was then interrogating Borella, asked him if Giles made any motion or attempt to act as though he was going to draw a weapon, and that Borella said "No;" that Borella indicated the movements of Giles by shoving his hand from about the front of his chest outward, to the right. He also testified that Borella said that he did not know why he shot him, and when asked if Giles had threatened him, said he had not. It is undisputed that Giles did not have a gun in his possession.

The statement of the deceased was admitted in evidence as a dying declaration. In it the deceased stated, among other things: "I didn't hit him. He was standing in the door. I started to go by him. I had nothing in my hand— no gun. I said nothing as I went by." In answer to a question put to him by the State's attorney as to what Borella did as he went by, Giles stated: "Just pulled out his gun and commenced shooting. I don't remember whether he said anything to me as he shot. I didn't say anything to him. * * * We had no fight there. He called me a liar up in the hall the same day and I hit him and knocked him down. He didn't do anything after that. I went down from the hall before he did. * * * I made no motion to reach for a gun or anything and I had no gun with me at the time. * * * Shooting happened in doorway at pool-room. He was standing right close to me. He shot about five times. While he was shooting I didn't do anything to him. I backed up catie-cornered across the sidewalk into the street. I was trying to get away from him all the time. I don't doubt that I am going to die. I don't believe that I am going to get well. So far as I am concerned I would just as soon see Buck [Borella] turned loose. If I die it won't do me any good whatever they do to him."

It is earnestly urged that it was error to admit this statement as a dying declaration, first, because it referred

to the trouble in Eagle's Hall, which was not a part of the *res gestæ* of the shooting; and second, because there was not proper proof made concerning the statement to admit it as a dying declaration.

J. G. VanKeuren testified that he formerly was judge of the county court of Perry county; that on the 16th day of April, two days after the shooting, he visited Giles in the Marshall Browning Hospital, in the city of DuQuoin, in company with the State's attorney and a Mr. Pyle; that upon going into the room where Giles was confined to his bed, the State's attorney asked him if he recognized him; that he said that he did; that he also said he recognized the witness and Pyle; that the State's attorney told him that they were there for the purpose of taking from him a dying statement, and asked him whether or not he knew he was going to die or whether he thought he was, and he said, "Well, I am going to fight for it;" that the State's attorney suggested that he had been shot four or five times. Giles afterwards, and before the taking of the statement, said: "I don't have any doubt but that I am going to die. I don't think I will pull through. I don't believe I am going to get well." The evidence of VanKeuren also showed that the attending physician had told Giles that morning that he could not live and that the nurse also told him that he could not get well, and that he was sinking very fast. The evidence of VanKeuren shows that Giles called for a drink of water two or three times during the taking of the statement, was lying with his eyes shut most of the time, was getting his breath in gasps and would nod his assent or dissent to the statement when read over to him; that the nurse was administering hypodermic injections in his arm. He died on the following morning. It cannot be doubted that he was *in extremis* and death was impending.

Dying declarations are statements of fact concerning the cause and the circumstances of the homicide, made by the victim under the solemn belief that his death is inevitable

and near at hand. (*People* v. *Savant*, 301 Ill. 225; *Dunn* v. *People*, 172 id. 582; *Simons* v. *People*, 150 id. 66; *Westbrook* v. *People*, 126 id. 81; *Barnett* v. *People*, 54 id. 325; *Starkey* v. *People*, 17 id. 17.) The rule is, that in order to make a dying declaration admissible a fixed belief in inevitable and imminent death must be entertained by the declarant. This, however, may be induced by the statements of the physician or nurse. It is not necessary that approaching death be presaged by the personal feelings of the deceased. The test is whether or not the declarant has abandoned hope of living and looked on death as certainly impending. If so, his declarations are competent though he is brought to that state of mind by statements made to him by nurses or physicians. (*People* v. *Buettner*, 233 Ill. 272; *People* v. *White*, 251 id. 67; *Westbrook* v. *People*, *supra*.) The fact that Giles at first stated, in answer to a question whether or not he knew he was going to die, "I will make a fight for it," is not, of itself, sufficient to disprove a state of mind viewing his death as certain and impending when the statement was made. We are of the opinion that from all the circumstances surrounding the taking of this statement sufficient ground was laid for its introduction.

It is also objected that the statement was not admissible as containing matter not a part of the *res gestæ*. Dying declarations are deemed, in law, to take the place of an oath, for the reason that every motive to falsehood has disappeared and the mind is influenced by the fact of impending death to speak the truth. Statements, therefore, made under such circumstances are admissible, not as a part of the *res gestæ* or of declarations made in the presence of the accused, but by reason of the likelihood that the declarant will speak the truth. Declarations of *res gestæ* are admissible on the ground that they are the natural and spontaneous utterances of the declarant so closely connected with the transaction in question as to be, in effect,

a part of it, there having been no opportunity for premeditation or design. (*People* v. *Willy*, 301 Ill. 307; *McMahon* v. *Chicago City Railway Co.* 239 id. 334; 1 Elliott on Evidence, sec. 538; 1 Wharton on Evidence, sec. 258.) A statement offered as a dying declaration, when made under the conditions prescribed by the law, is competent as to any matter material to the issue on trial, even though not admissible as a part of the *res gestæ*. (*People* v. *Sprague*, 217 N. Y. 373.) A statement may be competent either as a dying declaration or as a part of the *res gestæ* where it complies with the requirements of the law as to both. The dying declaration offered here complied with the rules of law and was admissible.

It is also urged that the court erred in giving instructions Nos. 2, 3 and 7 offered on behalf of the People.

The part of instruction No. 2 objected to told the jury that "the danger must be either real or apparent, imminent and pressing, or to appear to be imminent and pressing, and there must be some overt act on the part of the person killed apparently indicating the design upon the part of such person so killed to take the life of the defendant or to do him great bodily harm."

Instruction No. 3 is as follows:

"The court instructs the jury that, to justify the use of fire-arms in self-defense, the defendant in this case must show that the danger to his person was so urgent and pressing that a reasonable man would suppose, from the words, acts and conduct of John Giles at the time in question of the shooting, that it was necessary to shoot to save life or prevent great bodily harm, and that defendant, in shooting, believed, in good faith, that such urgent and pressing danger then existed."

It is contended that the latter part of instruction No. 2 erroneously told the jury that the danger which justifies killing in self-defense must be either real or apparent, imminent and pressing, and that such is not the law. The

question in such a case is not whether the evidence shows the danger to be real or otherwise, but whether the circumstances are such that the defendant, as a reasonable man, believed or was justified in believing that he was in great danger. (*People* v. *Durand*, 307 Ill. 611; *People* v. *Bartley*, 263 id. 69.) The instruction is not well drawn, but tells the jury that the circumstances must be such as were reasonably calculated to raise in the defendant's mind a reasonable and well-grounded belief that he was in imminent danger. This is but another way of saying that he must believe, as a reasonable man, that he was in such danger. While the portion of the instruction stating that the danger must be real or apparent, imminent and pressing, is not an accurate statement of law, it is largely robbed of its viciousness when considered in connection with the first sentence of the instruction. The instruction, therefore, while not accurately stating the law, is not, when read in connection with instruction No. 3, reversible error.

Defendant's instructions Nos. 1 and 2 fully and clearly stated the law of self-defense, and while instruction No. 2 given on behalf of the People is open to the objection that it is not clear, we are of the opinion that on the whole the jury were properly instructed on the question of the necessary elements of self-defense.

The objection to instruction No. 7 is, that it is argumentative and calls special attention of the jury to certain parts of the testimony in such a way as to impress them that the court attaches little significance to such testimony. The instruction is as follows:

"If you believe from the evidence in this case beyond a reasonable doubt that the defendant on or about the 14th day of April, A. D. 1923, in the county of Perry, in the State of Illinois, feloniously, willfully and of his malice aforethought shot and killed the deceased, John Giles, in the manner and form as charged in the indictment and not in self-defense, then you should find the defendant guilty

of murder and in such case, it would not be any complete defense in this case for the defendant that the deceased had knocked him down in the Eagle's Hall some two or three hours before the shooting."

The latter part of the instruction tells the jury that it would not be a complete defense that the deceased had knocked plaintiff in error down in Eagle's Hall some two or three hours before the shooting. It cannot be argued that this does not present a correct proposition of law, but the argument is that it calls attention to particular evidence and takes from the jury a vital part of the issue of self-defense. The instruction does not assume the existence of facts controverted, for the reason that there is no controversy in the evidence concerning what occurred in Eagle's Hall. The statement of the plaintiff in error on the witness stand as to the conversation between him and Giles, and what occurred there, shows that that occurrence does not constitute the defense of self-defense. From his statement it is evident that the disagreement arose over a discussion of the merits of two candidates for mayor. He does not say in his testimony that Giles threatened him with subsequent violence or injury. There is nothing in that occurrence that indicates that Giles was threatening further trouble with plaintiff in error or that plaintiff in error had any reason for apprehension that there would be such trouble. We are of the opinion that the instruction, though erroneous, was not in this case prejudicial to the plaintiff in error.

The jury heard the testimony concerning the shooting. Plaintiff in error's statement of attempted violence to him at that time is controverted by eye-witnesses to the shooting. The jury heard and saw the witnesses and decided the issues, on the defense made by plaintiff in error, against him. The record justifies their doing so.

There is no reversible error in the record, and the judgment of the circuit court will be affirmed.

*Judgment affirmed.*