COMMONWEALTH vs. HOWARD KEY, JR.

Suffolk.  March 3, 1980. — June 27, 1980.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & WILKINS, JJ.

*Homicide. Evidence,* Dying declaration, Court record, Other offense,
Cross-examination.  *Witness,* Impeachment.  *Practice, Criminal,*
Assistance of counsel.

There was no merit to a defendant's contention that the judge employed
an improper standard in his preliminary finding of admissibility of a
witness's dying declarations.  [22-23]
At a murder trial, there was sufficient evidence to warrant a finding that,
at the time the victim made certain statements to the police, he had
lost all hope of recovery and spoke under a sense of impending death.
[23-25]
Where multiple homicides result from one felonious act, the dying decla-
ration of one victim is admissible to prove the homicides of the other
common victims.  [26]
At a murder trial, the judge properly charged the jury with respect to dy-
ing declarations.  [26-27]
At the trial of a defendant charged with arson and murder, the judge did
not abuse his discretion in allowing the prosecutor to elicit on cross-
examination of the defendant that, while in public school, he had been
charged with lighting papers in his desk where defense counsel had
raised the issue of the defendant's difficulties in school.  [28-29]
At a criminal trial, the judge did not abuse his discretion in permitting the
prosecutor to continue questioning the defendant regarding his addic-
tion to heroin after the defendant's denial that he was addicted where
the questions were aimed at corroborating the issue of identity.
[29-30]
At a criminal trial, the judge did not abuse his discretion in permitting the
prosecutor to question the defendant concerning his girl friend's addic-
tion to heroin and her giving birth to the defendant's illegitimate
child.  [30]
At a criminal trial, a record of the defendant's conviction of a crime in
Virginia, attested to by a Virginia deputy clerk, was admissible under
G. L. c. 233, § 69, since Virginia law grants a deputy clerk the
authority to take charge of the records as required by § 69 and the case
law of the Commonwealth.  [31]

There was no merit to a defendant's contention that he was denied effective assistance of counsel at his murder trial.  [31-33]

INDICTMENTS found and returned in the Superior Court on July 13, 1977.

The cases were tried before *Brogna*, J.

*John Leubsdorf* for the defendant.

*John Kiernan*, Assistant District Attorney (*Kevin Connelly*, Special Assistant District Attorney, with him) for the Commonwealth.

HENNESSEY, C.J.  In March, 1978, a jury found the defendant guilty of murder in the first degree under two indictments.  The jury also found that the defendant had wilfully and maliciously burned a dwelling.  The court imposed two consecutive sentences of life imprisonment for the murders and a concurrent sentence of ten to fifteen years for the arson conviction.  The defendant's appeal is before this court on an assignment of errors under G. L. c. 278, § 33E.

We briefly outline the evidence as presented both at the voir dire and at the trial.  Certain facts, however, will be presented in more detail in connection with the defendant's various arguments.  In the early morning hours of September 7, 1971, an explosion and fire occurred in the first floor apartment at 5 Cedar Street in Roxbury.  Firefighters retrieved two men from the burning apartment.  One had been found in the living room; the other, in the kitchen.  Both men were severely burned.  The hands and feet of both had been bound with wire.  One had a metal and cloth gag in his mouth.  The victims, Louis Fobbs and William Evans, were taken to Massachusetts General Hospital, where Evans died a few hours later and Fobbs, early in the morning of September 8.

The core of the Commonwealth's case connecting the defendant with these deaths was a series of statements attributed to Fobbs.  The first statement simply blamed the defendant; the next two added that the defendant had tied the two victims, poured gasoline on them, and set them afire; the last stated that "Keys" had a gun and had rolled up his sleeve to show Fobbs the "track marks" (injection marks) on

his arm before he had blindfolded the two men and poured gasoline on them. The Commonwealth also presented the testimony of a neighbor who had heard an explosion and had seen a tall, slim, black male who wore brown pants and a tan jacket run down the street. One Claude James testified that he had driven down to Cape Cod on September 6, the day before the fire, with Fobbs, Evans, the defendant, and others, and that the defendant was then carrying a gun. He described Fobbs and Evans as a homosexual couple. He stated that he had seen the defendant on Tremont Street on September 9 or 10 with a bandaged arm.

The defendant took the stand in his own behalf. He denied committing the crime and having a gun at the time the crime was committed. He testified that he was a friend of Fobbs and Evans and that he had once stayed two months at their apartment. After experiencing trouble at school, the defendant dropped out in 1970 at the age of sixteen or seventeen and went to live in New York, where he supported himself as a musician. On September 6, 1971, during one of his occasional visits to Boston, he had gone to Cape Cod with Fobbs, Evans, and others — but not with Claude James. When they had returned that evening, the defendant was taken to his sister's house, where he was then staying, and he went to bed. After hearing on the radio the next morning that he was a suspect in a homicide, he returned to New York. Prior to his arrest in 1977, he lived in New York and Virginia.

The defendant alleges numerous errors with regard to his trial. He attacks on four grounds Fobbs' three statements that were designated dying declarations: (1) the trial judge employed an improper standard in his preliminary finding of admissibility; (2) the evidence did not support a finding that Fobbs had abandoned all hope of recovery; (3) the declarations were improperly admitted as evidence of the murder of any one other than the declarant; and (4) the judge's charge failed to inform the jury of the legal weaknesses of dying declarations. The defendant also contends that inadmissible and highly prejudicial evidence was used to impeach

his credibility, and that he received ineffective assistance of counsel. We reject the defendant's arguments and affirm the convictions.

1. We turn now to a consideration of the various claims relating to the dying declarations.

a. The defendant first argues that the judge utilized an improper standard in admitting Fobbs' statements as dying declarations. Under traditional Massachusetts procedure, the judge and then the jury are to determine whether the requirements for a dying declaration have been established by a preponderance of the evidence. *Commonwealth* v. *Polian*, 288 Mass. 494, 498-499 (1934). Since an awareness of impending death is essential to the admissibility of dying declarations, a judge must determine whether that condition exists before a declaration is admitted. *Id.* at 497. *Commonwealth* v. *Dunker*, 363 Mass. 792, 794 (1973). The judge made the following findings as to Fobbs' state of mind when he made the statements: "I am satisfied that he was under the impression, turned out to be right, that his chances of living were minimal at the time when he made these statements to Sergeant Whalen." "Fobbs knew he was about to die imminently." "Fobbs understood that he wasn't going to make it past morning." "Fobbs had been informed and understood that death was imminent and inevitable as most things are." "Fobbs knew that his death was imminent." "Fobbs knew about and was certain that he was about to die in a short time." The defendant argues that these findings were deficient because the judge did not find that Fobbs had abandoned all hope and lacked even the slightest expectation of recovery.[1] See *Commonwealth* v.

---

[1] The defendant's claim stems in part from the judge's charge to the jury on dying declarations. At one point, after stating that the declarations were admissible only if Fobbs were convinced he was going to die when he made them, the judge added: "And when I say convinced, I don't mean beyond all possibility, because we all know that a person, although he's pretty certain, he's sure that he's going to die, could always have a hope that he's going to live. But that's not what we're talking about. Did the man rationally, reasonably feel in his own heart, in his own mind, 'I'm going to die'?" The defendant argues that this explanation dispels

*Bishop*, 165 Mass. 148, 153 (1896). We disagree. There was no dilution of the traditional standard. The judge obviously appreciated that "consciousness of . . . certain doom" is the sine qua non of admissibility, *Shepard* v. *United States*, 290 U.S. 96, 100 (1933), and gave this element the "careful attention" it required. *Commonwealth* v. *Nolin*, 373 Mass. 45, 50 (1977). We do not disturb his preliminary findings of admissibility. See *Commonwealth* v. *Monahan*, 349 Mass. 139, 161 (1965); *Commonwealth* v. *Hoff*, 315 Mass. 551, 553 (1944); 5 J. Wigmore, Evidence § 1442, at 298-301 (Chadbourn rev. 1974).

b. The defendant also argues that the evidence does not support a finding that Fobbs had abandoned all hope of recovery. He relies specifically on Fobbs' only transcribed statement, which was taken in the hospital's Burn Unit the afternoon after the fire. In his statement Fobbs would not directly acknowledge that he was about to die.[2] We think it

---

any doubt as to the standard the judge used in his determinations of admissibility. We disagree. When the instructions on dying declarations are considered as a whole, it is evident that the judge charged on the proper standard. Moreover, later statements made when the jury requested additional instructions are clearly proper: "Now, we all realize that all of us may have some hope for a miracle. That's not what we're talking about. He's got to be convinced that he's going to die and that the statement — at the time that he makes the statement." "[H]ope for a miracle" is not, and cannot be equated to, an expectation of recovery. See *Commonwealth* v. *Hebert*, 264 Mass. 571, 576-577 (1928).

We note also that the defendant made no objections and took no exceptions with regard to the standard as explained in the charge. In these circumstances we will find reversible error under G. L. c. 278, § 33E, only "upon a showing of grave prejudice or substantial likelihood that a miscarriage of justice has occurred." *Commonwealth* v. *Roberts*, 378 Mass. 116, 123 (1979). See *Commonwealth* v. *Garcia*, 379 Mass. 422, 439 (1980). Cf. *Hankerson* v. *North Carolina*, 432 U.S. 233, 244 n.8 (1977). In applying this standard, we have considered the obliquely challenged statements in the context of the remainder of the charge and conclude that relief is not called for here. *Commonwealth* v. *Fitzgerald*, 376 Mass. 402, 425 (1978).

[2] The statement includes the following dialogue with Sergeant Whalen and Nurse Smyth:

THE SERGEANT: "How do you feel?"

THE DECLARANT: "I am just tired."

is clear that a declarant need not expressly state that he has abandoned every last flicker of hope. See *Commonwealth v. Viera*, 329 Mass. 470, 473 (1952). Apprehension of impending death may be inferred from circumstances, even if the declarant has made no explicit statement on the matter. *Id. Commonwealth v. Dunker*, 363 Mass. 792, 795 (1973). In the case at bar, there was clearly sufficient evidence for both the judge initially and the jury ultimately to find the requisite elements with regard to each statement that was introduced. When Officer Matthews told Fobbs of his imminent death while they were in the ambulance on the way to the hospital, Fobbs answered, "That's what I thought," or words to that effect. Then at the hospital Dr. Tofield told Fobbs that he would die within twenty-four to forty-eight hours, and Fobbs replied, "Well, that's the way it is." When, in response to his repeated inquiry, Nurse Smyth told Fobbs that he was dying, Fobbs became reflective and asked to telephone his grandfather. Thus, at times relevant to the declarations at issue, a police officer, a physician, and a nurse apprised Fobbs of his impending death. See *Commonwealth v. Nolin*, 373 Mass. 45, 50 (1977); *People v. Borella*, 312 Ill. 34, 44 (1924). In two of these instances he affirmed and adopted their appraisals; in the third, his actions were consistent with those of a man facing imminent death. Even Fobbs' responses to Sergeant Whalen, relied upon by the defendant as evidence of uncertainty and hope for survival (see note 2, *supra*), were not necessarily inconsistent with Fobbs' belief in the imminence of his death. Dr. Tofield testified that such responses are consistent with

---

THE SERGEANT: "Do you think you are going to come through this all right, do you think you are going to live?"

THE DECLARANT: "I feel okay. What does the doctor say?"

THE NURSE: "The doctor says you are going to have to get some rest here."

THE SERGEANT: "You heard the nurse say you have a fifty-fifty chance, do you think you are going to make it?"

(No answer.)

THE SERGEANT: "Louis, I'll see you in a couple of days?"

THE DECLARANT: "All right. What does the house look like up there?"

the abandonment of hope in that a person who knows that he is about to die will characteristically respond so as "to comfort the people around him" and to spare their sensibilities.

In addition to Fobbs' own remarks and reactions, there was testimony from those who observed him. Doctors Ott and Tofield, Nurses Bierbaum and Smyth, and Officer Matthews, each concluded that Fobbs realized he was about to die. It has been recognized that opinion evidence from a witness who has observed the dying declarant's condition and attitude is a valuable aid to the judge and jury. See, e.g., *Howard* v. *State*, 113 Neb. 67, 68 (1925); *State* v. *Gallagher*, 4 Wash. 2d 437, 445 (1940).

Moreover, there is general recognition that the declarant's sense of impending death may be inferred from the character of his injury. E.g., *Mattox* v. *United States*, 146 U.S. 140, 151 (1892); *United States* v. *Mobley*, 421 F.2d 345, 347 (5th Cir. 1970); *People* v. *Pollock*, 31 Cal. App. 2d 747, 755 (1939); *State* v. *Morran*, 131 Mont. 17, 32 (1957); *Bishop* v. *State*, 92 Nev. 510, 518 (1976); *State* v. *Bowden*, 290 N.C. 702, 712 (1976); *Commonwealth* v. *Cooley*, 465 Pa. 35, 43 (1975). Fobbs was alert, oriented, and rational, and could see for himself the full extent of his injuries. See *Commonwealth* v. *Haney*, 127 Mass. 455, 457 (1879). He could see the injuries of William Evans, the other victim, who lay five feet away from him in the emergency room. He could see the escharotomies performed on Evans and himself. He later learned that Evans had died and he was thereby prompted to ask, "Does that mean that I am going to die?" See *State* v. *Morran, supra.*

Thus, we conclude that on the evidence of what Fobbs said, saw, and heard, the judge and the jury could clearly have found by a preponderance of the evidence that "all hope of recovery [had] gone from [Fobbs'] mind and [that] he [spoke] under a sense of impending death." *Commonwealth* v. *Polian*, 288 Mass. 494, 497 (1934). Thus, the statements fell within the dying declaration exception to the hearsay rule.

c. The defendant next argues that Fobbs' dying declarations should not have been admitted as evidence of the murder of Evans. In this double homicide, both victims were killed by one felonious act. Only one victim lived long enough to make dying declarations. Whether those declarations are admissible in the trial of an indictment charging murder of a fellow victim, as is the situation here, is a question of first impression in this Commonwealth.

Historically, the common law has admitted dying declarations only where the declarant's own death is the subject of the homicide indictment. Respected authorities have long derided and repudiated this limitation as arbitrary and irrational.[3] 5 J. Wigmore, Evidence § 1436 (Chadbourn rev. 1974); McCormick, Evidence § 283, at 682 (2d ed. 1972). At trial, defense counsel advanced the common law rule in an attempt to limit the jury's consideration of Fobbs' statements to the issue of Fobbs' homicide. The judge rejected that rule as "outlandish," and we agree with him.

Where multiple homicides result from one felonious act, the dying declaration of one victim should be admitted to prove the homicides of the other common victims. *State* v. *Wilson*, 23 La. Ann. 558, 559-560 (1871). *State* v. *Terrell*, 46 S.C.L. (12 Rich.) 321, 329-330 (1859). Cf. *Commonwealth* v. *Stallone*, 281 Pa. 41, 44-46 (1924). In admitting Fobbs' declarations to prove the murder of Fobbs, the judge recognized the probable trustworthiness of the proffered evidence. The declarations were not less trustworthy when offered to prove the murder of Evans. Common sense justifies the judge's ruling. There was no error.

d. The defendant complains that the judge did not instruct the jury to receive the dying declarations, if at all,

---

[3] Recognizing the arbitrariness of the common law limitations on the admission of dying declarations, some States have substantially reworked the common law hearsay exception through judicial decision (see, e.g., *Thurston* v. *Fritz*, 91 Kan. 468 [1914] [expansion to civil cases]), or legislative action (see, e.g., Colo. Rev. Stat. § 52-1-20 [1963]). See also statutes cited in 5 J. Wigmore, Evidence § 1436 n.4, at 287-289 (Chadbourn rev. 1974).

with caution. Such an instruction was not required. Cf. *Commonwealth* v. *Chapman*, 8 Mass. App. Ct. 260, 268-269 (1979). Nor should the judge have been expected to lecture the jury on the niceties of the hearsay rule per se. The judge flatly told the jury, "[Y]ou don't have to believe anybody." Pursuant to the "humane rule" of criminal practice in this Commonwealth, the judge instructed the jury extensively on the preliminary facts they had to find before they could properly consider any of Fobbs' utterances as dying declarations. The judge twice instructed that, despite the legal theory supporting the trustworthiness of dying declarations, the truth of such declarations remained a jury question. The judge further instructed the jury that they might consider whether Fobbs was "competent to say what [he allegedly] said" and whether he answered questions "in a manner that showed that he knew what he was saying." We think these instructions were more than adequate to protect the defendant from any unreliability inherent in hearsay statements. As we stated in *Commonwealth* v. *Polian*, 288 Mass. 494, 499 (1934): "A party has no right to require the judge to argue the case for him. It is for the judge to decide to what extent he will state the evidence and discuss the possible inferences of fact that may be drawn from it." See also *Commonwealth* v. *Harris*, 376 Mass. 201, 208 (1978).

Within the context of the objections argued here, the method and extent of the charge were matters within the judge's discretion. *Commonwealth* v. *Roberts*, 378 Mass. 116, 129-130 (1979). No abuse of discretion has been shown. The judge clearly presented to the jury the issues of fact raised by the evidence, carefully explained the law applicable to the issues, and evenhandedly apprised the jury of all matters affecting credibility. The defendant was entitled to no more. *Commonwealth* v. *Therrien*, 371 Mass. 203, 206 (1976).

2. The defendant contends that he was denied a fair trial because inadmissible and highly prejudicial material was used to impeach his credibility. In particular, the defendant argues that certain questions posed by the prosecutor on

cross-examination of the defendant violated the established rule that a witness may not be impeached by evidence of bad acts or bad character. See, e.g., *Commonwealth* v. *Schaffner*, 146 Mass. 512, 515 (1888). He also points to the introduction of a foreign criminal conviction which he claims was not authenticated in accordance with G. L. c. 233, § 69, and which led to the introduction of two misdemeanor convictions more than five years old. See G. L. c. 233, § 21.

a. Two of the five alleged errors with regard to the prosecutor's cross-examination of the defendant were not the subjects of objections by the defendant, and we do not consider them here.[4] Of the three alleged areas of prejudicial questioning for which exceptions were saved, the defendant argues that the most harmful involved the eliciting of the fact that, while in public school, he had been charged with lighting papers in his desk. Since the present case involved arson and death by burning, the defendant presses the testimony's obvious dire impact upon the jury and invokes the rule that proof of previous bad deeds which have not been pursued to conviction and which are unconnected with the crime for which a defendant is charged cannot be received to prove that the defendant was guilty of the instant crime. See, e.g., *Commonwealth* v. *Rhoades*, 379 Mass. 810, 819 (1980); *Commonwealth* v. *Welcome*, 348 Mass. 68, 70 (1964); *Commonwealth* v. *Bishop*, 296 Mass. 459, 461-462 (1937).

While we agree with the defendant's statement of the law, we think that in the circumstances of this case the disputed testimony falls within the permissible scope of cross-examination. On direct examination, defense counsel had established that the defendant had experienced "[a] couple of things in school, a couple of problems" or "difficulties." As the judge recognized, defense counsel had "opened up" the subject. The prosecution was therefore entitled to pur-

---

[4] We have, however, considered all of the five alleged errors and their cumulative effect in performing our duty of plenary review under G. L. c. 278, § 33E.

sue the nature of the defendant's school problems.[5] See
*Commonwealth* v. *Leger*, 264 Mass. 217, 220 (1928); *Commonwealth* v. *Kaplan*, 238 Mass. 250, 256 (1921); *Commonwealth* v. *Shaw*, 145 Mass. 349, 350 (1887). "It is axiomatic that a defendant subjects himself to cross-examination
when he chooses to testify on his own behalf." *Commonwealth* v. *Hicks*, 375 Mass. 274, 278 (1978). The scope of
that cross-examination lies within the sound discretion of
the trial judge. *Id. Commonwealth* v. *Sandler*, 368 Mass.
729, 737-738 (1975). *Commonwealth* v. *Mitchell*, 367
Mass. 419, 420 (1975). The defendant has not shown in this
instance that the judge abused his discretion.

As a second example of alleged prejudicial interrogation
the defendant points to questioning concerning his asserted
addiction to heroin. The defendant admits that this issue
had "some relevance" to the case, but he argues that the
prosecutor's repeated queries following the defendant's initial denial of addiction amounted to irremediable prejudice.
Although the question is close, we cannot say that the judge
abused his discretion in permitting the continued interrogation on this subject. It will be recalled that·Fobbs, before
he died, spoke of "track marks" on his assailant's arm. Thus
the questions regarding drug addition addressed and attempted to corroborate the issue of identity squarely raised by
Fobbs' final declaration. See Fed. R. Evid. 404(b); Goldstein, Trial Technique, § 19.06 (2d ed. 1969). Cf. *Thompson* v. *United States*, 144 F. 14, 19 (D. Mass. 1906). They
were focused on the period when the murders occurred.
While this corroboration was not essential, it was nonetheless an important aspect of the Commonwealth's case. After
the defendant's initial, negative answer, the prosecutor continued his questioning based in part on a Suffolk County jail
medical record, which apparently stated that the defendant

---

[5] We note that the prosecutor was careful to pursue this line of questioning through general, nonleading questions. The fact that material was
used to refresh the defendant's exhausted memory does not derogate from
the proper form of the questions.

"had used heroin on and off." The judge excluded this record, but the prosecutor was not bound to anticipate the judge's exclusionary ruling. Cf. *Commonwealth* v. *Cheek*, 374 Mass. 613, 617 (1978). This was not an attempt by the prosecution to communicate impressions by innuendo when there was no evidence on which to base the queries. See *Commonwealth* v. *Fitzgerald*, 376 Mass. 402, 414 (1978); *Commonwealth* v. *White*, 367 Mass. 280, 284 (1975).

The defendant's third objection centers on questions concerning his former girl friend. In the context of his possible use of heroin, the defendant was asked whether his "girlfriend was addicted to heroin at that time." The defendant argues that such a question manifested an attempt to prove guilt by association. See *Commonwealth* v. *Szemetum*, 3 Mass. App. Ct. 651, 653 (1975). The defendant also argues that the prosecutor's question with regard to his girl friend's giving birth to an illegitimate child was highly improper. The Commonwealth argues that it had a good faith basis for the inquiry with regard to the girl friend's addiction. It points to a written statement given by the defendant's sister and referring to drug addiction, about which the defendant stated: "I don't believe she was referring to me. I believe she was referring to the girl." With respect to the second inquiry, the Commonwealth argues that it was merely underscoring an improbability in the defendant's testimony. When the prosecutor asked the defendant to give his girl friend's last name, the defendant replied with uncertainty, whereupon the prosecutor asked: "Didn't she have your child?" The Commonwealth asserts that this was an attempt to prove the existence of intimacy between the defendant and his girl friend in order to raise the inference that the defendant's uncertainty was "disingenuous." Although the relevance and materiality of the two challenged questions was slight, the questions were nevertheless sufficiently relevant to issues at trial to render them admissible within the judge's discretion, particularly in view of the fact that they were asked during cross-examination. See *Commonwealth* v. *Hicks*, 375 Mass. 274, 278 (1978).

b. The defendant's final evidentiary challenge concerns the alleged improper authentication of a 1977 Virginia conviction for possessing stolen property. Because this conviction was admitted, the Commonwealth was also able to impeach the defendant with two 1970 misdemeanor convictions for receiving stolen goods and attempted larceny. The latter convictions would not have been admissible because of their age had there not been a more recent conviction. G. L. c. 233, § 21. The Virginia conviction was attested to by a Virginia deputy clerk in the name of the clerk. Section 69 of G. L. c. 233 allows the introduction of records of conviction of an out-of-State court if the record is "authenticated by the attestation of the clerk or other officer who has charge of the records of such court under its seal." We have previously construed the statute to require that "where the certifying officer is other than the clerk, it should appear by the certificate *or otherwise* that he has 'charge of the records'" (emphasis added). *Willock* v. *Wilson*, 178 Mass. 68, 74-75 (1901). In this case there was no such certificate. However, it appears that under Virginia law a deputy clerk "may discharge any of the official duties of [his] principal." Va. Code § 15.1-48 (Supp. 1979). We take judicial notice of this statute, G. L. c. 233, § 70, and conclude that Virginia law grants a deputy clerk the authority to take "charge of the records" as required by our statute and case law. Cf. *Ramey* v. *Harber*, 431 F. Supp. 657, 664-665 (W.D. Va. 1977), modified, 589 F.2d 753 (4th Cir. 1978), cert. denied, 442 U.S. 910 (1979). Accordingly, we reject the defendant's contention that his 1977 Virginia conviction was improperly authenticated.

3. The defendant also maintains that he was deprived of effective assistance of counsel.[6] He points to trial counsel's failure to stress in his closing argument the defendant's lack of motive and counsel's failure to challenge the credibility of Fobbs, whose dying declarations constituted the bulk of

---

[6] We note that the defendant's counsel on appeal did not represent the defendant at trial.

the Commonwealth's case against the defendant.  In addition, the defendant claims that there were prejudicial omissions in defense counsel's cross-examination of certain prosecution witnesses.  Having viewed the case as a whole, see *Commonwealth v. Adams*, 374 Mass. 722, 729 (1978), we disagree.  The defendant's ineffective assistance claims fail to meet the often-cited standard for measuring ineffective assistance of criminal counsel: "whether there has been serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer — and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth v. Rondeau*, 378 Mass. 408, 411-412 (1979), quoting *Commonwealth v. Saferian*, 366 Mass. 89, 96 (1974).

The defendant first takes trial counsel to task for having failed to place greater emphasis in his closing argument on the absence of evidence of motive.  We note, however, that trial counsel did sound this theme in his closing.  Counsel could reasonably conclude that, given the overwhelming evidence of guilt, repeated references to the lack of an established motive could only underscore the wantonness of the murders.  Counsel appears to have profitably and subtly developed the theme of lack of motive during his direct examination of the defendant by establishing the defendant's assertedly unblemished friendship with the victims.

It is well established that the credibility of the declarant of a dying declaration is subject to attack.  E.g., 5 J. Wigmore, Evidence § 1446 (Chadbourn rev. 1974).  But merely because Fobbs' credibility was subject to dispute does not mean that it was necessarily wise to launch such an attack.  It is likely that the jury, having glimpsed the anguish of the victim's final hours, would have reacted adversely to the imputation that Fobbs spoke falsely and wickedly.  We cannot say that trial counsel should have risked giving such offense.  Moreover, counsel did obliquely assail the reliability of Fobbs' declarations by attacking the credibility of the most

vulnerable of the witnesses who reported them, Officer Matthews.

Contrary to the defendant's claims, trial counsel's cross-examination of Claude James was competent. Counsel uncovered several improbabilities and internal inconsistencies so as to demonstrate the likelihood of recent contrivance. In argument, defense counsel made a forceful effort to make James' testimony "look ridiculous." We conclude that counsel's attempt to discredit James' testimony was thorough. As a final instance of ineffectiveness, the defendant points to counsel's handling of testimony by Fireman Culbert. There was nothing material to be gained by cross-examination of this witness. His direct testimony, at trial and at voir dire, did no appreciable damage to the defense. Trial counsel should not be forced to pursue cross-examination of relatively innocuous witnesses in order to avoid later accusations of incompetence.

The record demonstrates that "the basic trouble from the defense standpoint was weaknesses in the facts rather than any inadequacy of counsel." *Commonwealth* v. *Satterfield*, 373 Mass. 109, 111 (1977). The defendant has made no convincing showing that better work could have accomplished something better for the defense. *Commonwealth* v. *Williams*, 378 Mass. 217, 240 (1979). In sum, the Commonwealth's case against the defendant was compelling, and "trial counsel was left with few cards to play." *Commonwealth* v. *Domaingue*, 8 Mass. App. Ct. 228, 234 (1979).

4. We have examined the entire case on the law and the evidence and have concluded that there is no basis under G. L. c. 278, § 33E, on which to order a new trial or direct the entry of a verdict of a lesser degree of guilt.

*Judgments affirmed.*