COMMONWEALTH *vs.* JON C. LITTLE.

No. 00-P-1306.

Barnstable. January 18, 2002. - May 28, 2002.

Present: GREENBERG, KAFKER, & COHEN, JJ.

*Evidence,* Hearsay, Dying declaration, Photograph.

At a murder trial, the judge did not err in admitting evidence of a claimed dy-
    ing declaration, allegedly heard by a witness to the killing, where the judge
    was satisfied that the Commonwealth had met all the preliminary elements
    of admissibility, and the judge properly instructed the jury that the Com-
    monwealth had the burden of satisfying them by a fair preponderance of
    the evidence that the elements of proof existed before considering the
    statements as evidence. [879-881]

At a murder trial, the judge's admission in evidence of photographs of the
    defendant's hands and arms as proof that the defendant had sustained no
    defensive wounds, but which also showed tattoos depicting a certain
    bigoted organization, even if constituting error, was not prejudicial given
    that the combination of eyewitness testimony, physical evidence, and
    circumstantial evidence showing consciousness of guilt on the defendant's
    part made the Commonwealth's case very strong. [881-882]

INDICTMENTS found and returned in the Superior Court Depart-
ment on December 1, 1998.

The cases were tried before *Gerald F. O'Neill, Jr.,* J.

*Carlo A. Obligato,* Committee for Public Counsel Services,
for the defendant.

*Julia K. Holler,* Assistant District Attorney, for the
Commonwealth.

GREENBERG, J. On October 14, 1998, the defendant, a thirty-
six year old homeless man, had an altercation with the victim,
Paul Peterson, over an abandoned railroad shed in Hyannis.
Their argument, warmed by vodka, burst into violence. While
the defendant's female companion, Ruth McHenry, looked on,
the two combatants, armed with knives, fought one another. The
defendant, with assistance from McHenry, prevailed, and Peter-

son died almost immediately from multiple stab wounds. About two hours later, a Barnstable police officer saw smoke billowing from the area of the shed and called the fire department. While Barnstable firefighters were extinguishing the conflagration, they discovered Peterson's body and removed it to the county medical examiner's office.

The defendant and McHenry were indicted for the victim's murder on December 1, 1998. Eventually, McHenry negotiated a plea with the Commonwealth, whereby in return for her guilty plea and testimony, she would not have to serve jail time. Largely on her testimony and much forensic evidence concerning stab wounds, the defendant was convicted by a Superior Court jury on charges of murder in the second degree and conspiracy to commit arson.[1] The principal claim of error is that the trial judge wrongly admitted evidence of a claimed dying declaration, allegedly heard by McHenry.

1. *Facts.* The defendant and McHenry were taken to the Barnstable police station for questioning immediately after the fire and discovery of Peterson's body. For a time, the defendant obfuscated and tried to shift the blame for the killing to McHenry and Elliot Long, another vagrant who at the defendant's behest had purchased a can of diesel fuel and torched the shed. Held overnight and questioned again, the defendant ultimately admitted that he had fought and killed Peterson, but in self-defense.

Assuming that in defending himself against Peterson, the defendant was not justified in using deadly force, which resulted in his conviction for second degree murder, the question remains whether the defendant killed the victim with the requisite malicious intent required for murder. Or, as the defendant has urged, he simply used excessive force in defending himself against Peterson's attack and thus, at most, was guilty of manslaughter. At trial, the defendant's testimony was mostly consistent with his last statement to the police that he did not stab Peterson until Peterson attacked him with a knife, and he had a grip on Peterson's knife-wielding hand. The defendant argues, and the

---

[1] The defendant was acquitted of a larceny charge, which suggests that the jury believed the defendant and disbelieved McHenry regarding who stole Peterson's money.

Commonwealth does not refute, that the challenged portion of McHenry's testimony about what Peterson said as his death neared contradicted the defendant's account of the killing, and may have been crucial to the jury's decision to convict the defendant of second degree murder.

McHenry's testimony was along the following lines: when she and the defendant arrived at the shed, Peterson was already inside. As a quarrel between the two men erupted, she turned toward them and saw Peterson swing at the defendant with a knife, which nicked his nose. To assist the defendant, she grabbed Peterson's hand and pried the knife out of his grasp. She threw it over her shoulder. Thus disarmed, Peterson stood face-to-face with the defendant, who also held a knife with blood stains on the blade. Then the defendant, according to Mc-Henry, grabbed Peterson's right arm under the elbow and stabbed him twice in the chest. Moments later, he stabbed Peterson twice more in the chest.

Then came the disputed testimony. McHenry described Peterson lying wounded on the floor and said that he cried out, "You've killed me, let me die in peace." Also, according to McHenry, upon hearing Peterson's entreaty, the defendant repeatedly jumped on his chest and said, "die, die, die, die." She concluded by testifying that it was the defendant who came up with the idea of torching the shed and enlisted Long to obtain diesel fuel because it would "burn better." After the fire, McHenry testified that Long joined the two of them at a nearby motel room where he reported that he had carried out the defendant's plan.

2. *The dying declaration.* As McHenry's testimony concerning Peterson's last words were hearsay, they were inadmissible unless the Commonwealth could qualify them as "dying declarations." In Massachusetts, the traditional common-law dying declaration rule provides that (1) in a prosecution for homicide (2) committed upon the declarant, (3) the declarant's out-of-court statement in regard to the manner in which he met his death is admissible, (4) provided he believes his death is imminent, and (5) provided he does in fact die within a short time. See *Commonwealth* v. *Vona*, 250 Mass. 509, 511 (1925). But see *Commonwealth* v. *Key*, 381 Mass. 19, 23-25 (1980) (expand-

ing rule to apply to manner of death of others besides declarant). Before admitting the statements, and in response to the defendant's argument for a preliminary ruling, the judge discussed the foregoing principles with the prosecutor and trial counsel. Although, as the defendant points out, the judge did not conduct a voir dire of McHenry to determine whether the statements were admissible, he satisfied himself that the Commonwealth had met all of the preliminary elements of admissibility. The judge correctly indicated that he would instruct the jury that the Commonwealth had the burden to satisfy them by a fair preponderance of the evidence that the aforementioned five elements of proof existed before considering the statements as evidence. *Commonwealth* v. *Key*, 381 Mass. at 22. And, in fact, he gave that instruction to the jury.

The defendant now complains, although he did not make this argument below, that even if McHenry's statements met the technical requirements for dying declarations, they nonetheless lacked what the defendant calls "probable trustworthiness." Absent this hallmark of reliability, the defendant claims that the trial judge should have excluded the statements as a matter of law. In essence, he argues that the judge abused his gatekeeping function.

In the defendant's view, what the judge failed to consider in his preliminary analysis was that McHenry, as proponent of the victim's statements, had a particular axe to grind. That is to say, she was a former codefendant in the case and, as such, had an interest in its outcome. Another factor which, in the defendant's view, renders McHenry's testimony unreliable is that she did not disclose Peterson's dying declarations until January or February, 2000, nearly fifteen months after the killing and only after she had secured a plea bargain from the Commonwealth.

The defendant contends that the admission of Peterson's dying declarations prejudiced him because they furnished a reason for the jury to decide that he killed Peterson with a malicious intent, rather than by using excessive force. Without such proof, the defendant argues, the verdict would have been manslaughter. However, the touchstone of admissibility is not prejudice. Rather, the ultimate question is whether the statements qualified as admissible dying declarations.

We reject the defendant's argument that the prerequisites for admission of Peterson's dying declaration included whether McHenry, as proponent of his statements, was credible and trustworthy as a witness. None of the cases support that proposition. Whether to believe the witness who repeats the dying person's declaration has always been a jury question. See *Commonwealth* v. *Lee*, 324 Mass. 714, 720 (1949) ("humane practice" instruction allows jury another opportunity to evaluate whether prerequisites for dying declaration are met). Professor Wigmore puts it this way: "the dying declaration being in effect a testimonial statement made out of court, [] the declarant is open to impeachment and discrediting in the same way as other witnesses, [] so far as such process is feasible." Wigmore, Evidence § 1446 (Chadbourn rev. ed. 1974). He makes no mention of a judge making preliminary findings with respect to the proponent's credibility.

We do not underestimate the various weaknesses that the defendant emphasizes concerning McHenry's reliability as a witness and her self-interest in the outcome of the case. She was exhaustively cross-examined on these points. Indeed, the judge's instructions mentioned, among other things, that the jury could consider McHenry's motive for testifying, whether she displayed any bias in testifying, and whether or not she had any interest in the outcome of the case. We see no abuse of discretion, let alone a substantial risk of a miscarriage of justice.

For the first time on appeal, the defendant also claims that physical injuries to the victim's larynx necessarily established the physical impossibility of the victim speaking as he was dying. This, too, was a matter best left for the jury to determine. Nothing in the record confirms, one way or the other, the medical hypothesis that the defendant now proposes as rendering Peterson's dying utterances physically impossible. Nor does the record shed any light as to the timing of the larynx laceration; that is, whether it happened before or after the verbal declaration. These considerations do not affect the admissibility of McHenry's testimony. Again, such an evaluation of the evidence was for the jury. The point was argued forcefully to the jury by defense counsel in his closing statement.

3. *Damaging photographs.* The remaining issue argued by

the defendant involves the admission of two photographs of his hands and arms. These photographs were offered by the Commonwealth as proof that the defendant had no defensive hand wounds, contrary to his statement that he had warded off Peterson's attack before using deadly force. The defendant's argument is that the trial judge, as defense counsel requested, easily could have ordered the prejudicial portions of the photographs redacted. That simple procedure would have eliminated tattoos that may have identified him with the "Aryan nation," despised in most quarters as a bigoted, neo-Nazi group. So also, the Confederate flag tattoo could have been eliminated to avoid the divisive stereotype disfavoring the defendant.

However, in the circumstances presented here, even if we assume that the judge's ruling allowing the photographs, including the tattoos, was error, it was not prejudicial because we are convinced that " 'the judgment was not substantially swayed' by it." *Commonwealth* v. *Rosado*, 428 Mass. 76, 79 (1998), quoting from *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994), quoting from *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983). The combination of eyewitness testimony, physical evidence, and circumstantial evidence showing consciousness of guilt on the defendant's part made the Commonwealth's case very strong.

*Judgments affirmed.*